No. 22-70013

# In the United States Court of Appeals for the Fifth Circuit

WALTER ALEXANDER SORTO,

*Petitioner-Appellant,*

*v.*

BOBBY LUMPKIN, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

*Respondent-Appellee.*

On Appeal from the United States District Court
for the Southern District of Texas, Houston

## RESPONSE/OPPOSITION TO THE MOTION FOR A CERTIFICATE OF APPEALABILITY

JOHN SCOTT
Provisional Attorney General

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

LANORA C. PETTIT
Acting Solicitor General

KATHRYN M. CHERRY
Assistant Solicitor General
Kathryn.Cherry@oag.texas.gov

Counsel for Respondent-Appellee

# Certificate of Interested Persons

No. 22-70013

Walter Alexander Sorto,

*Petitioner-Appellant,*

*v.*

Bobby Lumpkin, Director, Texas Department of Criminal Justice, Correctional Institutions Division,

*Respondent-Appellee.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellee, as a governmental party, need not furnish a certificate of interested persons.

/s/ Kathryn M. Cherry

Kathryn M. Cherry
*Counsel of Record for*
*Respondent-Appellee*

i

## Statement Regarding Oral Argument

Twenty-one years ago, Walter Sorto and his co-defendant kidnapped, raped, and murdered two women. Sorto's conviction and sentence have been upheld through direct appeal and multiple rounds of post-conviction relief—some of which raised the very claim presented here. The current habeas petition has been pending for more than a decade. This most recent appeal presents a simple application of this Court's mandate rule as well as a straightforward interpretation of the Anti-Terrorism and Effective Death Penalty Act (AEDPA). Given those circumstances, respondent does not think oral argument is warranted. It would merely lead to yet further delays without significantly aiding the Court's resolution of the issues presented. If, however, the Court deems oral argument to be helpful, respondent would request to participate.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons.............................................................................. i

Statement Regarding Oral Argument....................................................................... ii

Table of Contents ....................................................................................................... iii

Table of Authorities ................................................................................................... v

Introduction ................................................................................................................ 1

Statement of Jurisdiction .......................................................................................... 3

Issues Presented ......................................................................................................... 4

Statement of the Case ................................................................................................ 4

    I.    The Rape and Murder of Maria Rangel and Roxana Capulin ..................... 4

    II.   Sorto's Trial .................................................................................................... 6

    III. Post-Conviction Proceedings........................................................................ 8

        A.   Sorto's first and second state habeas petitions (2005-2006)................ 8

        B.   Sorto's initial federal habeas proceedings (2010)................................. 9

        C.   Sorto's third state habeas petition (2010-2011) ................................. 10

        D.   Sorto's return to district court (2011-2016) ........................................ 12

        E.   Sorto's first appeal to this Court (2016-2018)..................................... 14

        F.   Sorto's second return to district court (2018-2023) ...........................15

Summary of the Argument.........................................................................................16

Standard of Review ....................................................................................................17

Argument .................................................................................................................... 18

    I.    The District Court Correctly Interpreted the Scope of This Court's Remand. ........................................................................................ 18

    II.   Sorto Is Not Entitled to a Certificate of Appealability. ............................ 21

        A.   Sorto has not met his burden to obtain a certificate of appealability on his habeas claim, originally filed in 2010. ................. 23

        B.   Any putative deficiencies in Texas's post-conviction processes do not excuse Sorto from AEDPA's requirements............ 37

Conclusion .................................................................................................................. 45

Certificate of Service.................................................................................................. 46

Certificate of Compliance ......................................................................... 46

# Table of Authorities

Page(s)

**Cases:**

*Atkins v. Virginia*,
536 U.S. 304 (2002) ................................................................. *passim*

*Austin v. Davis*,
876 F.3d 757 (5th Cir. 2017) ............................................... 36

*Ayestas v. Davis*,
138 S. Ct. 1080 (2018) ................................. 2, 4, 15, 16, 18, 20, 28, 29, 30, 31, 32

*Ayestas v. Davis*,
933 F.3d 384 (5th Cir. 2019) .............................................. 31

*Batchelor v. Cain*,
682 F.3d 400 (5th Cir. 2012) ............................................. 28

*Blue v. Thaler*,
665 F.3d 647 (5th Cir. 2011) ................................ 25, 26, 33, 34, 42

*Ex Parte Blue*,
230 S.W.3d 151 (Tex. Crim. App. 2007) .......................... 42, 43

*In re Bonvillian Marine Serv., Inc.*,
19 F.4th 787 (5th Cir. 2021) ............................................. 39

*Busby v. Davis*,
925 F.3d 699 (5th Cir. 2019) .......................................... 26, 37, 42

*City of Milwaukee v. Illinois*,
451 U.S. 304 (1981) ........................................................ 39

*Clark v. Thaler*,
673 F.3d 410 (5th Cir. 2012) ............................................ 25, 41

*Coleman v. Thompson*,
501 U.S. 722 (1991) ........................................................ 43

*Crawford v. Cain*,
No. 20-61019, 2023 WL 3560479 (5th Cir. May 19, 2023) .............................. 27

*Crutsinger v. Davis*,
898 F.3d 584 (5th Cir. 2018) ........................................... 31, 32

*Cullen v. Pinholster*,
563 U.S. 170 (2011) ......................... 3, 12, 16, 23, 24, 25, 26, 33, 38, 39

*Davila v. Davis*,
137 S. Ct. 2058 (2017) ..................................................... 38, 43, 44

*Deters v. Collins*,
    985 F.2d 789 (5th Cir. 1993) ........................................................... 41, 44

*Duckworth v. Serrano*,
    454 U.S. 1 (1981) ................................................................................. 41

*Duncan v. Walker*,
    533 U.S. 167 (2001) ............................................................................... 3

*Engel Indus., Inc. v. Lockformer Co.*,
    166 F.3d 1379 (Fed. Cir. 1999) .......................................................... 21

*Fuller v. Rich*,
    11 F.3d 61 (5th Cir. 1994) ................................................................... 41

*Harrington v. Richter*,
    562 U.S. 86 (2011) ............................................................................... 33

*Ex parte Hearn*,
    310 S.W.3d 424 (Tex. Crim. App. 2010) ............................................... 7

*Hernandez v. Thaler*,
    Civ. No. 08–805, 2011 WL 4437091 (W.D. Tex. Sept. 23, 2011) ...... 35

*Hunt v. United States*,
    106 F. App'x 888 (5th Cir. 2004) ........................................................ 28

*Ibarra v. Thaler*,
    691 F.3d 677 (5th Cir. 2012) .............................................................. 40

*Jones v. Davis*,
    927 F.3d 365 (5th Cir. 2019) ........................................................ 17, 30

*Jones v. Jones*,
    163 F.3d 285 (5th Cir. 1998) .............................................................. 43

*Lewis v. Quarterman*,
    541 F.3d 280 (5th Cir. 2008) .................................................. 38, 39, 40

*Maldonado v. Thaler*,
    625 F.3d 229 (5th Cir. 2010) ........................................................ 33, 35

*McQuiggin v. Perkins*,
    569 U.S. 383 (2013) ............................................................................ 27

*Moore v. Texas*,
    139 S. Ct. 666 (2019) .......................................................................... 37

*Morris v. Dretke*,
    413 F.3d 484 (5th Cir. 2005) .............................................................. 24

*Perez v. Stephens*,
    784 F.3d 276 (5th Cir. 2015) .............................................................. 20

*Petetan v. State*,
    622 S.W.3d 321 (Tex. Crim. App. 2021) ............................................. 42

*Rhines v. Weber*,
    544 U.S. 269 (2005) ........................................................................... 3

*Rivera v. Quarterman*,
    505 F.3d 349 (5th Cir. 2007) ............................................................ 23

*Roberts v. Dretke*,
    356 F.3d 632 (5th Cir. 2004) ............................................................ 24

*Sells v. Stephens*,
    536 F. App'x 483 (5th Cir. 2013) ...................................................... 41

*Shinn v. Ramirez*,
    142 S. Ct. 1718 (2022) ............................................ 25, 27, 32, 34, 39

*Shoop v. Hill*,
    139 S. Ct. 504 (2019) ....................................................................... 32

*Shoop v. Twyford*,
    142 S. Ct. 2037 (2022) ............................................................... 26, 27

*Sorto v. Davis*,
    716 F. App'x 366 (5th Cir. 2018) ....................................................... 15

*Sorto v. Davis*,
    859 F.3d 356 (5th Cir. 2017) ................................... 14, 15, 35, 41

*Sorto v. Davis*,
    881 F.3d 933 (5th Cir. 2018) ...................................................... 15, 20

*Sorto v. State*,
    173 S.W.3d 469 (Tex. Crim. App. 2005) ........................... 2, 4, 5, 6, 8

*Sorto v. Thaler*,
    No. H-10-CV-613 (S.D. Tex., Feb. 25, 2010) ..................................... 9

*Ex parte Sorto*,
    No. WR-71, 381-03, 2011 WL 1533377 (Tex. Crim. App. Apr. 20,
    2011) ............................................................................................. 12, 23

*Ex parte Sorto*,
    Nos. WR-71,381-01; WR-71,381-02, 2009 WL 483147 (Tex. Feb.
    25, 2009) ........................................................................................ 8, 9

*Sossamon v. Lone Star State of Tex.*,
    560 F.3d 316 (5th Cir. 2009) ............................................................ 36

*M.D. ex rel Stukenberg v. Abbott*,
    929 F.3d 272 (5th Cir. 2019) ............................................................ 21

*Trevino v. Thaler*,
    569 U.S. 413 (2013) ................................................................. 29

*United States v. Campbell*,
    168 F.3d 263 (6th Cir. 1999) ................................................... 21

*United States v. Candelario-Santana*,
    916 F. Supp. 2d 191 (D.P.R. 2013) .........................................11

*United States v. Hamlet*,
    480 F.2d 556 (5th Cir. 1973) ................................................... 30

*United States v. Hernandez*,
    48 F.4th 367 (5th Cir. 2022) ............................................. 18, 19

*United States v. Matthews*,
    312 F.3d 652 (5th Cir. 2002) ................................................... 20

*United States v. Pineiro*,
    470 F.3d 200 (5th Cir. 2006) ..........................................17, 18, 19

*United States v. Reyna*,
    304 F. App'x 263 (5th Cir. 2008) ...........................................19

*United States v. Tisdale*,
    678 F. App'x 246 (5th Cir. 2017) .......................................... 20

*Vasquez v. Hillery*,
    474 U.S. 254 (1986) ................................................................. 38

*Ward v. Stephens*,
    777 F.3d 250 (5th Cir. 2015)................................................... 44

*Williams v. Taylor*,
    529 U.S. 420 (2000) ...........................................................3, 27, 42

**Consitutional Provisions, Statutes, and Rules:**

18 U.S.C.:
    § 3599................................................................................... 29
    § 3599(f)................................................................... 28, 29, 31
    § 3599(g)(2) ........................................................................ 29

28 U.S.C.:
    § 1291 .................................................................................... 3
    § 2254 ................................................................3, 26, 27, 43
    § 2254(b)(1)(B)(ii) ................................... 13, 23, 38, 39, 41
    § 2254(d) ................................................... 16, 22, 23, 15
    § 2254(d)(1) ............................................. 14, 22, 25, 26, 32

§ 2254(d)(1)–(2) ................................................................. 22

§ 2254(d)(2) ............................................... 14, 25, 26, 33

§ 2254(e)(1) ........................................ 14, 16, 23, 32, 33

§ 2254(e)(2) ................................................... 25, 27, 31

§ 2254(e)(2)(A) ............................................................... 27

§ 2254(e)(2)(B) ............................................................... 27

Fed. R. Civ. P. 59(e) ........................................................ 14

Tex. Code Crim. Proc. art.:

11.071 ................................................................... 8, 42

11.071 § 5 ....................................................................... 9

11.071 § 5(a) .............................................................. 12

11.071 § 5(a)(1) .......................................................... 26

11.071 § 5(a)(3) .............................................. 11, 23, 26

11.071 § 5(c) ............................................................... 26

## Introduction

On the night of May 31, 2002, the husbands of Maria Rangel and Roxana Capulin were frantic: the two women had stayed until closing at the restaurant where they worked in Houston but never returned home. Roxana did not answer the phone when her husband called. And when the two men arrived at the restaurant, it was empty, and Roxana's car was missing from the parking lot. When Roxana's car was finally found, she and Maria were inside it, dead of gunshot wounds to the head and showing signs of sexual assault. Two months later, Walter Sorto tried to collect a $5,000 reward offered by "Crimestoppers" by pretending to have witnessed a friend commit the heinous crimes. When Sorto learned that investigators had located DNA of the perpetrators, he claimed that the putative villain in his story had forced Sorto to have sex with the dead body of one of the victims. Unconvinced, local prosecutors charged Sorto and his co-defendant with murder.

The State provided Sorto with two experienced lawyers, two doctors, an investigator, and a mitigation specialist for his defense. The clinical psychiatrist, Dr. Susana Rosin, conducted extensive testing of Sorto and determined his IQ was 95—more than 20 points higher on the scale of intellectual functioning than the cut-off used to determine "retardation."[1] The forensic psychiatrist, Dr. Seth Silverman, interviewed Sorto and found that he did not exhibit any signs of adaptive deficits,

---

[1] "Retardation" was the standard term used for intellectual disability at the time of Sorto's trial and remains the term used in much of the case law discussed in this brief. Respondent uses the terms "intellectually disabled" and "mentally retarded" interchangeably without any pejorative intent.

which are another aspect of intellectual disability. Abandoning that tack, his trial counsel instead focused on mitigation, including by investigating Sorto's claims that he had PTSD and had been exposed to hazardous chemicals that may have affected his brain functioning. His mitigation specialist went so far as to travel to Sorto's hometown in El Salvador to recreate his childhood there, including interviewing his first-grade teacher. And counsel flew in Sorto's family to testify at the mitigation stage.

Nevertheless, those strategies did not prevent the jury from sentencing him to death, a conviction and sentence affirmed on direct review in 2005. *Sorto v. State*, 173 S.W.3d 469 (Tex. Crim. App. 2005), *cert denied* 548 U.S. 926 (2006).

Eighteen years and three state habeas petitions later, Sorto claims that both of his psychiatric experts were wrong at the time of trial, and he actually is intellectually disabled. Using funds obtained from federal court, he has found a psychiatrist to testify that his IQ is under 70, which he asserts exempts him from execution under *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). Moreover, Sorto insists, the failure of the federal district court to order relief based on this newly created evidence after his state habeas application was dismissed or after this Court's remand was an abuse of discretion.

Sorto is wrong on all counts. To start, the district court correctly interpreted this Court's remand to be limited to the question of whether, after having his state habeas application dismissed, he was entitled to funding under *Ayestas v. Davis*, 138 S. Ct. 1080 (2018), to develop that claim in federal court. The district court's application of *Ayestas* to grant Sorto additional funding was wrong, but the court correctly denied

relief anyway. "Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Williams v. Taylor*, 529 U.S. 420, 437 (2000). AEDPA "leaves primary responsibility with the state courts" to resolve constitutional claims. *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). Allowing habeas petitioners to receive federal funding to support unexhausted state claims before returning to state court disincentivizes them from exhausting claims in state court *prior* to filing their federal petitions, undermining "AEDPA's goal of streamlining federal habeas proceedings," *Rhines v. Weber*, 544 U.S. 269, 277 (2005), and "the goals of comity and federalism that the exhaustion requirement serves," *Duncan v. Walker*, 533 U.S. 167, 180 (2001). Providing funds for Sorto to further develop his *Atkins* claim is also not reasonably necessary—Sorto is not entitled to impeach the state court's findings based on evidence improperly developed in a federal court. *See Pinholster*, 563 U.S. at 182.

## Statement of Jurisdiction

Sorto invoked the district court's jurisdiction under 28 U.S.C. § 2254. ROA.11. On November 17, 2022, the district court issued an amended final judgment disposing of Sorto's habeas petition pursuant to 28 U.S.C. § 2254 and denying Sorto's request for a certificate of appealability. ROA.1219, 1558. Sorto timely filed a notice of appeal on December 15, 2022. ROA.1559–61. Jurisdiction exists in this Court under 28 U.S.C. § 1291.

### Issues Presented

Following this Court's limited remand to reconsider the availability of funding in the light of *Ayestas*, Sorto was permitted to seek yet another psychiatric opinion regarding his intellectual function. Now armed with an IQ score allegedly 30 points below his score at the time of trial, Soto insists that the state habeas court's decision years earlier that he had not adequately supported his successive habeas *Atkins* claim was unreasonable. The district court refused to allow Sorto to shoehorn his new evidence into a state habeas petition filed nearly a decade before. The issues presented are:

1. Whether the district court correctly followed the mandate rule by only re-examining Sorto's funding requests in the light of *Ayestas v. Davis*.

2. Whether Sorto is entitled to a certificate of appealability on the district court's dismissal of his 2010 *Atkins* claim, and whether Texas's state-corrective process adequately protected Sorto's rights when it rejected that claim.

### Statement of the Case

## I.   The Rape and Murder of Maria Rangel and Roxana Capulin

Sorto no longer disputes that in 2002, he and his co-defendant Edgardo Cubas kidnapped Maria Rangel and Roxana Capulin from a parking lot in Houston, raped them, and shot them to death. *Sorto v. State*, 173 S.W.3d 469, 472 (Tex. Crim. App. 2005). Rangel and Capulin worked at El Mirador restaurant in Houston and stayed late that evening to close the restaurant. *Id.* Though Roxanna's husband expected her to be late, when she did not arrive home by 10:30 p.m., he called the restaurant.

*Id.* No one answered. *Id.* He drove to the restaurant to look for her but found her car gone, the restaurant lights off, and the door unlocked. *Id.* Accompanied by Maria's husband, he entered the restaurant, but they found no one inside. *Id.*

A witness later saw Roxana's Dodge Durango and noticed blood on the ground by the back passenger door and called the police. *Id.* Roxana's and Maria's bodies were in the car with duct tape over their eyes and mouths, showing signs of sexual assault. *Id.* at 472–73. Roxana had died from a single gunshot wound to her head; Maria had been shot twice. *Id.* at 473.

Sorto contacted police about two months later, seeking the $5,000 reward offered by Crimestoppers for information regarding the gruesome murder. *Id.* He accused two of his associates—Cubas and 14-year-old Eduardo Navarro—of abducting and murdering the women. *Id.* Although he had been invited to participate, Sorto claimed that he had refused and then trailed the two would-be rapists. *Id.* Sorto told police that he had seen them abduct the women and followed them as they drove to a remote location. *Id.* He described watching the Durango for 30 minutes, during which he saw one woman attempt to escape the car and run away before being dragged back to the car by Cubas. *Id.* When Sorto heard three gunshots, he drove away. *Id.* Sorto also claimed that Navarro saw him drive away, and when he later encountered Cubas and Navarro at a bar, Cubas threatened to kill Sorto and his family if he talked. *Id.*

When the interviewing detective asked Sorto for a saliva sample, Sorto changed his story. *Id.* Understanding that investigators had the assailants' DNA, Sorto now claimed that Cubas had forced him to have sex with Maria's corpse. *Id.* The

detectives interviewing Sorto then learned that Sorto had an outstanding warrant for his arrest and took Sorto into custody. *Id.* at 474.

Sorto later admitted that he was with Cubas, together they abducted the women as they were leaving the restaurant, and he drove the car while Cubas duct-taped their eyes and mouths. *Id*. Although he admitted to raping Maria, he claimed he stayed outside of the car while Cubas did the same to Roxana. *Id*. Then, Sorto insisted, he walked away, telling Cubas to let the women go in passing. *Id*. Instead, Cubas shot them. *Id*. Sorto returned to the car, and Cubas dropped him and Navarro back home. *Id*.

A database search using Sorto's DNA revealed that he had also been involved in the rape and murder of a 14-year-old girl, Esmeralda Alvarado, whom he and Cubas had kidnapped as she was using a payphone. *Id*. Again, Sorto eventually admitted to raping the girl with Cubas but claimed Cubas killed her on his own. *Id.* at 475. In fact, Sorto claimed that he and Cubas intended to let her go, but she asked them if they intended to leave her in the deserted location to which they had taken her. *Id*. After that, they picked her back up and killed her. *Id*.

## II. Sorto's Trial

In 2003, these facts were presented to a jury, and Sorto was convicted of capital murder and sentenced to death. *Id.* at 471. At trial, Sorto was represented by two experienced lawyers, Alvin Nunnery and Patrick F. McCann. ROA.1762, 1766. As counsel would later explain, they had hired two psychiatrists, Dr. Susana Rosin and Dr. Seth Silverman; a licensed investigator, Rudy Vargas; and a mitigation specialist, Lisa Milstein. ROA.951–52, 1763, 1766.

As relevant here, Sorto's defense team explored whether he might have an intellectual disability that exempted him from the death penalty under *Atkins*. Dr. Rosin tested Sorto's full-scale IQ using the Spanish edition of the Wechsler Adult Intelligence Scale (WAIS), the Escala de Inteligencia Weschler para Adultos (EIWA) test. ROA.950, 957–58. Before trial, his IQ was determined to be 95, ROA.957–58, 1578—exceeding by far the "rough ceiling" of 70, "above which a finding of mental retardation in the capital context is precluded." *Ex parte Hearn*, 310 S.W.3d 424, 430 (Tex. Crim. App. 2010). Dr. Silverman also examined Sorto and "detected no real evidence of [cognitive] impairment." ROA.1766. Those results were consistent with counsels' observations in their interactions with Sorto, who "showed no cognitive impairments, despite some testimony of his family that he had difficulty in the first grade." ROA.379, 566, 1766. In addition, Sorto "was clearly aware of his situation and able to assist [counsel] in his case, and provided [them] with a great deal of information that was helpful." ROA.1766.

After concluding that *Atkins* was not a viable route to avoid a death sentence, Sorto's counsel chose to focus instead on mitigation. Milstein traveled to El Salvador with an interpreter. ROA.1763, 1766. As a result of her efforts, the defense was able to present six witnesses at the punishment phase, including some of his relatives from El Salvador. ROA.503. Sorto's mother, aunt, younger sister, wife, and grandmother testified about the circumstances surrounding his birth, life in El Salvador, exposure to the country's civil war, the poverty and abuse he sustained, his abandonment by his mother, schooling, and work in the fields. ROA.503–04. They testified that he maintained jobs in construction and cleaning ships, contributed financially to

the family and paid for household expenses, and married and had three children with his wife Juana. ROA.494. At no time did they offer evidence that during his adult life he had problems with interpersonal skills, responsibility, self-direction, understanding of money, occupational skills, or the ability to function in daily life. ROA.494.

The jury rejected Sorto's mitigation theory, sentencing him to death in November 2003. ROA.414, 2364–65. And the Texas Court of Criminal Appeals affirmed his conviction and sentence in October 2005. *Sorto v. State*, 173 S.W.3d 469 (Tex. Crim. App. 2005), *cert. denied* 548 U.S. 926 (2006).

## III. Post-Conviction Proceedings

### A.  Sorto's first and second state habeas petitions (2005-2006)

With the assistance of counsel, Sorto filed his first post-conviction application for a writ of habeas corpus in the convicting court on July 13, 2005. ROA.1613. He raised 15 points of error, including an ineffective-assistance-of-trial-counsel (IATC) claim asserting that trial counsel failed to investigate Sorto's PTSD from exposure to war in El Salvador and past exposure to hazardous chemicals. ROA.2281–82; *Ex parte Sorto*, Nos. WR-71,381-01; WR-71,381-02, 2009 WL 483147 (Tex. Feb. 25, 2009) (per curiam) (not designated for publication). He did not raise an *Atkins* claim. ROA.2279–362.

In 2006, Sorto filed a pro se motion to "amend" the initial habeas application his counsel filed the year before. ROA.2261–62. Because it was filed beyond the time allowed for supplementing or amending an existing habeas claim, Tex. Code Crim. Proc. art. 11.071, the Texas Court of Criminal Appeals (CCA) took this putative

amendment as a subsequent application. ROA.1613. In that application, Sorto raised an *Atkins* claim for the first time. ROA.2262–64 (*Sorto v. Thaler*, No. H-10-CV-613 (S.D. Tex., Feb. 25, 2010)). He provided no evidence in support of his claim of intellectual disability, but simply asked for an assessment for mental retardation. ROA.2262–64. The CCA denied Sorto relief on his initial (counseled) state habeas petition and dismissed the subsequent (pro se) application under Article 11.071, section 5. *Ex parte Sorto*, 2009 WL 483147.

## B. Sorto's initial federal habeas proceedings (2010)

With the assistance of new counsel, Sorto filed for federal habeas relief, re-raising his earlier claims and requesting funding to further develop (among other things) his *Atkins* claim. ROA.1208–09, 1613; *Sorto v. Thaler*, No. H-10-CV-613 (S.D. Tex. Feb. 25, 2010). Sorto filed three motions for funds with the district court. ROA.1208. First, he requested funds for a psychologist "to assist counsel in the litigation of [his] *Atkins* claim." ROA.1208–09. The district court denied the request because Sorto had not shown that his claims were "procedurally viable": his federal pleadings had additional facts that "exceeded the contours of what he put before the state courts," meaning his claim may not have been exhausted, and he failed to show what testing had already been done. ROA.1209. The court instructed Sorto that "any renewed motion for funds would need to show that he had exhausted the claims." ROA.1210. Sorto then filed his federal habeas petition, "introduc[ing] a more robust *Atkins* claim . . . than he had briefed in his *pro se* state court pleading." ROA.1210. "Acknowledging . . . that his initial federal petition may have contained procedural defects," Sorto requested "permission to cure procedural deficiencies by exhausting

remedies in state court rather than face dismissal." ROA.1210. At the same time, Sorto renewed his funding request for expert assistance to develop his *Atkins* claim. ROA.1210. The court found the *Atkins* claim was procedurally defaulted; it also "surveyed the record" and found that Sorto had failed to show that "additional exploration of his *Atkins* claim was reasonably necessary in light of contradictory evidence in the record." ROA.1211. Sorto renewed his funding request two months later, this time conceding that state-court relief was available and asking for a stay of federal proceedings to exhaust his IATC claim. ROA.1211–12. The court stayed the case for him to do so and exhaust his *Atkins* claim in state court. ROA.1212.

Sorto repeatedly requested funding through *ex parte* motions, often without notifying the State that any funding issue had arisen at all. To the State's knowledge, Sorto did not attempt to address the court's concerns before taking his *Atkins* claim back to state court.

## C.  Sorto's third state habeas petition (2010-2011)

Sorto again raised his *Atkins* claim as a second subsequent (third total) state habeas application in the CCA. ROA.1618. Sorto's latest state habeas petition included evidence from his new expert, Dr. Martinez, a clinical psychologist. ROA.1367. In support of his petition, Sorto provided evidence that he had been administered a test of nonverbal intelligence (TONI) test in 2003 by Texas Department of Criminal Justice (TDCJ) employees when he was admitted to death row and scored a 66, which was "well within the range of significantly subaverage intellectual functioning." ROA.1366, 1661. Although Sorto admitted that he took a prior IQ test using EIWA, ROA.1659, he did not disclose that he scored 95, ROA.957, or even provide a scaled

score to a different full-scale IQ test. *Contra United States v. Candelario-Santana*, 916 F. Supp. 2d 191, 200 (D.P.R. 2013) (providing EIWA-III scores scaled to the WAIS III test when the expert believed EIWA overestimates scores). Instead, Sorto merely asserted that the EIWA overestimated IQ by 20-25 points, without giving a number from which to subtract 20, ROA.1659—suggesting that the score was so high that Sorto would *still* not have fallen in the category of subaverage intelligence.[2]

Sorto also provided affidavits from friends and family describing behaviors he claimed demonstrated that he suffered deficits in adaptive skills, which Dr. Martinez reviewed. ROA.1366–67, 1661. Based in part on those reports from friends and family members who knew Sorto as a child or adolescent, Dr. Martinez suggested further inquiry into whether Sorto was intellectually disabled was warranted but did not diagnose Sorto as intellectually disabled. ROA.1367, 1661.

Because Sorto was on his third petition and claimed neither actual innocence nor the inability to raise the claim earlier, the CCA could "not consider the merits of or grant relief" unless, by clear and convincing evidence, that "but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury." Tex. Code Crim. Pro. art. 11.071, § 5(a)(3). The CCA stated that it had "reviewed this second subsequent application" but found that Sorto "failed to make a threshold presentation of

---

[2] The district court ordered Sorto's experts to disclose their data and reports in 2014, revealing that Sorto's full-scale IQ score of 95 on the EIWA would not have placed him below the level of subaverage functioning even if it *were* 20 points off. ROA.912 n.30.

evidence that, if true, is sufficient to show that no rational factfinder would fail to find that he is mentally retarded," or provided "sufficient specific facts" to prove a constitutional error in sentencing. ROA.1213–14, 1614. The CCA therefore dismissed the application as failing to meet the requirements of Article 11.071, section 5(a), in April 2011. ROA.1213–14, 1614; *Ex parte Sorto*, No. WR-71, 381-03, 2011 WL 1533377, at *1 (Tex. Crim. App. Apr. 20, 2011) (per curiam) (not designated for publication).

Nine days before the CCA dismissed Sorto's third state habeas petition, the Supreme Court decided *Pinholster*, 563 U.S. at 181–82, which affirmed that AEDPA prohibited federal courts from using new evidence to assess state court past decisions. *See* ROA.1367.

### D.  Sorto's return to district court (2011-2016)

When Sorto returned to federal court to challenge the CCA's dismissal of his habeas application, he filed multiple requests for additional funding to support his *Atkins* claim. In 2013, the court authorized Sorto to retain a mental health expert to test him for mental retardation. ROA.1214. Specifically, the district court agreed that "[i]n light of the record developed to this point, and having considered the arguments in Sorto's recent pleadings, the Court finds that psychological testing for mental retardation is reasonably necessary." ROA.578.

Using that funding, Sorto's expert Dr. Martinez administered the WAIS-III test and determined that Sorto's full-scale IQ score was 63, ROA.660, 724 (Martinez's report)—more than thirty points lower than the score he received shortly before trial. ROA.957. Regarding intellectual functioning, Dr. Martinez concluded that

12

Sorto's academic scores were "well below expected levels" and consistent with his IQ scores, and "[t]he overall pattern of cognitive and intellectual functioning is strongly indicative of intellectual disability." ROA.727. About adaptive functioning, Dr. Martinez stated only that there were suggestions of deficits and that "[a] comprehensive adaptive functioning assessment is strongly recommended to confirm this diagnosis of intellectual disability." ROA.727.

After testing concluded, Sorto amended his habeas petition. ROA.1214. But because Sorto had still not found an expert to affirm that Sorto was, in fact, intellectually disabled, *see* ROA.727, 1138, he sought yet further funds for "additional intellectual-disability testing" on more than one occasion. ROA.1214. The court granted the first funding request but denied the other when the district court noted that Dr. Martinez had still not completed a full report concerning Sorto's adaptive deficits. ROA.991–92. In a subsequent motion, Sorto argued that the state court had unreasonably held that he did not make a prima facie case of intellectual disability despite his TONI score of 66, which was available to it in 2010, and its denial of funding was a violation of due process. ROA.1006–07. Moreover, Sorto argued, the state-court process was ineffective at safeguarding his rights and he was entitled to proceed on his claim in federal court under 28 U.S.C. § 2254(b)(1)(B)(ii). ROA.1006.

In 2015, the district court denied Sorto's request for additional funds as well as habeas relief. ROA.1180. It first determined that the state court had not violated Sorto's due process rights by dismissing his *Atkins* claim because he had not made a prima facie showing of intellectual disability. ROA.1129. As a result, the state court's decision was entitled to deference under AEDPA, in that its "determination of the

facts" had to be "unreasonable" before relief could be granted, 28 U.S.C. § 2254(d)(2), and its "determination of a factual issue . . . [was] presumed to be correct," *id.* § 2254(e)(1). ROA.1129. Under this deferential standard, the district court found that Sorto could not show the CCA's denial of his 2010 *Atkins* claim was an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(1). ROA.1143–44.

In a subsequent 2016 opinion addressing a motion under Federal Rule of Civil Procedure 59(e), the district court expressed concern with Sorto's presumption that federal courts fund factual development for claims, then send them back to state court for exhaustion. ROA.1217. The court noted that "[s]uch a principle violates the spirit of the AEDPA generally, the exhaustion doctrine specifically, and [the Supreme Court's] stay-and-abeyance mechanism." ROA.1217.

## E. Sorto's first appeal to this Court (2016-2018)

This Court denied Sorto's requests for a certificate of appealability on a claim that his *Miranda* rights were violated when he was subjected to a custodial interrogation and his trial counsel provided ineffective assistance by failing to develop mitigation evidence. ROA.1336. But the Court requested supplemental briefing on the question of whether the State had an ineffective process for pursuing his *Atkins* claim. ROA.1348–49. It ultimately concluded that Sorto's claim was *not* exhausted because Sorto's full-scale IQ score of 63 fundamentally altered his claim. *See Sorto v. Davis*, 859 F.3d 356, 361–63 (5th Cir. 2017), *op. withdrawn on grant of reh'g*, 881 F.3d 933 (5th Cir. 2018). It then found the Texas corrective process ineffective in protecting Sorto's right to raise his unexhausted *Atkins* claim because the CCA would

provide funding only if Sorto made a prima facie case of intellectual disability, when habeas counsel needed state-court funds to make his prima facie case. *Id*. at 363–65. On that ground, the panel vacated the district court's denial of funding. *Id.* at 365.

In response to a petition for rehearing en banc, the panel subsequently withdrew its initial opinion and judgment, stating a "revised opinion will be forthcoming." *Sorto v. Davis*, 881 F.3d 933 (5th Cir. 2018) (per curiam). Shortly thereafter, *Ayestas v. Davis*, 138 S. Ct. 1080 (2018), was decided. Because funding decisions are discretionary, and "the district court ha[d] not had the opportunity to consider how *Ayestas* might apply," the Court concluded that "the issue is best considered by the district court in the first instance." ROA.1354 (*Sorto v. Davis*, 716 F. App'x 366, 366 (5th Cir. 2018) (per curiam)). The Court's judgment specifically provided that "the cause is remanded for [the district court's] consideration of its denials of funding in light of *Ayestas*." ROA.1351; *see also* ROA.1354.

### F.  Sorto's second return to district court (2018-2023)

On remand, the district court granted Sorto funding so that Dr. Martinez could provide a full report on Sorto's adaptive deficits. ROA.1436. The court determined, however, that the language of the remand order and this Court's mandate rule limited the scope of its review to reconsidering the funding issue. ROA.1533–34. As a result, the district court reentered judgment denying habeas relief because the state court's denial of Sorto's 2010 habeas petition was not contrary to, or an unreasonable application of, federal law, or its determination of the factual issues incorrect by clear and convincing evidence. ROA.1556, 1558; *see* 28 U.S.C. § 2254(d), (e)(1). Sorto purported to appeal the district court's interpretation of the Court's prior

mandate and sought a certificate of appealability regarding the denial of habeas relief from this Court. ROA.1559–61.

## Summary of the Argument

**I.**   To start, Sorto is wrong that the district court misunderstood the scope of this Court's remand order when it limited its review to reconsidering the denial of funding under *Ayestas*. The Court's mandate remanded for "consideration of [the prior] denial[] of funding in light of *Ayestas*." ROA.1351. Pursuant to the mandate rule, the district court correctly followed the Court's explicit instructions and considered only the effect of *Ayestas* on the denial of funding.

**II.**   The district court was wrong to grant funding on remand because, as it correctly acknowledged, AEDPA restricted its view to the record before the state court when it denied Sorto's habeas petition—in 2010. *Pinholster*, 563 U.S. at 181–82. And none of the evidence gathered after that can be presented in federal court regarding that claim. Nothing in *Ayestas* supports granting funding to develop evidence that cannot be considered by the federal court.

Regardless, the district court was right to deny habeas relief. Under AEDPA, Sorto is eligible for federal habeas relief only if the state court's determination of the facts is "unreasonable" in the light of the evidence before it or clearly established law of the U.S. Supreme Court, and he can show that the decision was incorrect on the facts by clear and convincing evidence. 28 U.S.C. § 2254(d), (e)(1). Sorto cannot do either. The affidavits Sorto submitted concerning his supposed adaptive deficits contradicted those same affiants' testimony during Sorto's trial. Moreover, Sorto neither disclosed the IQ score he received pre-trial nor offered a contemporary full-

scale IQ core. And contrary to the vague suggestions of Sorto's federal habeas expert, Sorto's trial counsel and trial experts reasonably believed he was not intellectually disabled. In the light of that record, the CCA's dismissal of Sorto's *Atkins* claim for failing to make a prima facie showing of intellectual disability must be upheld by this Court. As a result, Sorto is not entitled to the federal relief he seeks.

Sorto also claims that he is entitled to simply avoid the state post-conviction process and rely on the post-2010 evidence adduced with the aid of the district court's grants of funding, because Texas's rules do not adequately protect *Atkins* claimants who fail to raise their claims during trial or their first post-conviction habeas application but instead wait to raise the claims until their subsequent state habeas proceedings. But the State's post-conviction process is not inadequate simply because Sorto is unable to meet that burden given the wealth of evidence disproving his *Atkins* claim, the dearth of evidence supporting it, and his delay in raising his *Atkins* claim.

## Standard of Review

This Court "review[s] de novo a district court's interpretation of [its] remand order, including whether the law-of-the-case doctrine or mandate rule forecloses any of the district court's actions on remand." *United States v. Pineiro*, 470 F.3d 200, 204 (5th Cir. 2006) (per curiam) (emphases omitted). It reviews the district court's decision on a funding request for abuse of discretion. *Jones v. Davis*, 927 F.3d 365, 373 (5th Cir. 2019).

**ARGUMENT**

This Court should affirm the district court's dismissal of Sorto's federal habeas claim with prejudice. The district court correctly interpreted the Court's remand to be limited to the question of whether he was entitled to funding under *Ayestas*. The district court should have held that he was not because he is not entitled to federal funding to develop evidence that the federal courts may not consider. Notwithstanding that error, however, the district court correctly denied habeas relief because reasonable jurists would not consider post-2010 evidence in assessing the reasonableness of the CCA's 2010 decision that Sorto was not intellectually disabled. Sorto cannot overcome that conclusion by making meritless allegations that Texas's post-conviction processes are deficient. And based on the record before the CCA, reasonable jurists could not debate that Sorto failed to make a prima facie showing of intellectual disability.

## I.   The District Court Correctly Interpreted the Scope of This Court's Remand.

The district court correctly held that its authority to decide Sorto's *Atkins* claim was limited by the mandate rule. "Under the law of the case doctrine, an issue of fact or law decided on appeal may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal." *United States v. Hernandez*, 48 F.4th 367, 370 (5th Cir. 2022). "The mandate rule, which is a corollary or specific application of the law of the case doctrine, prohibits a district court on remand from reexamining an issue of law or fact previously decided on appeal and not resubmitted to the trial court on remand." *Pineiro*, 470 F.3d at 205 (footnote omitted). The rule

18

encompasses issues "decided both expressly and by necessary implication." *Id.* This Court "review[s] de novo a district court's interpretation of [its] remand order, including whether the law-of-the-case doctrine or mandate rule forecloses any of the district court's actions on remand." *Id.* at 204 (emphases omitted).

For example, in *Hernandez*, the Court initially vacated Hernandez's sentence because the record did not support the trial court's enhancement and subsequently higher sentence for his crime, but it gave no other instruction for resentencing on remand. 48 F.4th at 369. In the second appeal, the Court held that the trial court was correct to consider additional evidence submitted by the State supporting the enhancement on remand and to resentence Hernandez based on the enhancement. *Id.* at 371. This Court clarified that "when the case is remanded for resentencing without specific instructions, the district court *should* consider any new evidence from either party relevant to the issues raised on appeal." *Id.* By contrast, the trial court could not consider issues that were *not* raised on appeal. *Id.* This Court contrasted that broad mandate with an order in which the Court "mandate[d] a particular result or limit[ed] consideration to only particular evidence on remand." *Id.* And in *United States v. Reyna*, this Court held that "the district court erred in determining, based on the [pre-sentencing report's] description of his conduct, that Reyna's prior conviction was a controlled substance offense." 304 F. App'x 263, 265 (5th Cir. 2008) (per curiam). The district court could fix the error as it deemed fit on remand because "[t]here is nothing in our mandate which would prohibit the district court from looking at the charging documents and judgment and making a new determination on this issue." *Id.*

By contrast, this Court not infrequently issues mandates with specific instructions about how an error is to be corrected. When it does so, this Court "adopt[s] a restrictive rule for interpreting the scope of the mandate"—particularly in the context of criminal sentencing. *United States v. Matthews*, 312 F.3d 652, 658 (5th Cir. 2002). For example, in *United States v. Tisdale*, the Court found that a sentence for criminal mortgage fraud was incorrect because "it failed to consider whether the mortgages were resold on the secondary market." 678 F. App'x 246, 247 (5th Cir. 2017) (per curiam). The Court subsequently upheld the district court's resentencing, which "did not consider Appellants' unrelated objections" except "the narrow issue of the mortgages that were sold on the secondary market." *Id.* at 248; *see also, e.g.*, *Perez v. Stephens*, 784 F.3d 276, 282 n.2 (5th Cir. 2015) (per curiam).

Here, the scope of this Court's remand was quite narrow: it vacated "the district court's denials of funding and remand[ed] for its consideration of its denials of funding in light of *Ayestas*." ROA.1354. This Court explained that it had issued an opinion on "whether the district court abused its discretion in denying requests for funding that would have enabled Sorto to obtain testing to determine whether he has an intellectual disability," then, "[a]fter considering the Director's petition," granted rehearing and *withdrew* the opinion. ROA.1354 (citing *Sorto v. Davis*, 881 F.3d 933). And the Court gave the district court "the opportunity to consider how *Ayestas* might apply to the denials of funding" in Sorto's case in the first instance. ROA.1354.

The district court did just that: it "granted funding under the standard articulated in *Ayestas*" and—consistent with its prior advisory—"terminated [the remand] upon the completion of the expert assessment." ROA.1533–34. It rejected

Sorto's argument, repeated here (at 31–33), that because the Court closed the prior appeal rather than retaining jurisdiction, the district court could "reconsider any issue not expressly rejected" by this Court based on the specific language in the mandate. ROA.1554. To do otherwise would have been reversible error. *E.g.*, *M.D. ex rel Stukenberg v. Abbott*, 929 F.3d 272, 277–78 (5th Cir. 2019) (rejecting "the district court's well intentioned attempt to fix" perceived problems because "eliminating those problems was not what the district court was charged with doing on remand").

Sorto counters (at 31-32) that "the effect of a vacated judgment is that 'all is effectively extinguished.'" But the appellate court always controls the scope of remand, *cf. Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379, 1383 (Fed. Cir. 1999) ("Unless remanded by [an appellate] court, all issues within the scope of the appealed judgment are deemed incorporated within the mandate and thus are precluded from further adjudication."), which "can be either general or limited in scope. Limited remands explicitly outline the issues to be addressed by the district court and create a narrow framework within which the district court must operate." *United States v. Campbell*, 168 F.3d 263, 265 (6th Cir. 1999) (collecting cases). That is precisely what this Court did and what the district court was required to—and properly did—respect.

## II. Sorto Is Not Entitled to a Certificate of Appealability.

Because the district court ultimately respected the scope of a federal court's review of a state criminal conviction, Sorto is not entitled to a certificate of appealability on the merits of his habeas petition. Specifically, under binding Supreme Court

precedent, Sorto cannot attack the reasonableness of the 2010 state court adjudication of his *Atkins* claim based on evidence never put before the state court.

Given that the new evidence was therefore irrelevant to the resolution of Sorto's habeas claim, the district court should have denied funding rather than allow Sorto to drag out this litigation for years developing inconclusive evidence of an intellectual disability that his own trial counsel concluded did not exist. And because Texas's post-conviction processes are sufficient to safeguard his rights, Sorto cannot avoid that outcome through baseless allegations that they are constitutionally deficient.[3]

---

[3] Sorto puts forth the new argument (at 22) that because the evidence he presented to the state court in 2010 is, while insufficient to meet the State's prima-facie requirement, "more than sufficient to satisfy this Court's burden for a prima facie case," and "[c]onsequently, reasonable jurists would find that the CCA's decision to the contrary was unreasonable within the meaning of section 2254(d)." As far as the State is aware, this argument has not been raised before. But in any event, it is wrong. Section 2254(d) prevents habeas petitioners from relitigating claims that have already been "adjudicated on the merits in State court proceedings" unless the adjudication resulted in "an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1)–(2). For Sorto's argument to make sense, section 2254(d)(1) would allow relitigation of previously adjudicated claims if the result was contrary to "Federal Law," full stop. In other words, AEDPA forecloses Sorto's argument (at 22) that simply requiring a different standard of proof than federal law violates section 2254(d)(1). The relitigation bar exempts circumstances where a state court may violate the law of the U.S. Supreme Court only—it sets the bar much higher than Sorto claims.

### A. Sorto has not met his burden to obtain a certificate of appealability on his habeas claim, originally filed in 2010.

The district court correctly denied Sorto's habeas petition. *Pinholster* prohibits Sorto from attacking the state court's ruling on his *Atkins* claim with new evidence, and AEDPA deference forecloses relief. The CCA's dismissal of Sorto's *Atkins* claim under article 11.071 § 5(a)(3) is a merits-based determination. *See Rivera v. Quarterman*, 505 F.3d 349, 359 (5th Cir. 2007) (Texas's "antecedent showing of 'sufficient specific facts' to merit further review" for *Atkins* claims renders dismissals of such claims as abuses of the writ merits decisions); *see also Ex Parte Sorto*, 2011 WL 1533377, at *1 (Tex. Crim. App. Apr. 20, 2011) (concluding that Sorto had failed to state a prima facie *Atkins* claim). As a result, Sorto must overcome the strict requirements of the relitigation bar in section 2254(d), as well as the presumption that the state court's factfinding is correct in section 2254(e)(1). And in the light of the evidence refuting his claim of intellectual disability that was before the state court, Sorto cannot do so.

Unable to overcome those definitive barriers to relief, Sorto attempts to evade them by arguing (at 23) that his *Atkins* claim, bolstered by "material additional evidentiary support" Sorto accrued thanks to federal funds post-2010, is a new, unexhausted claim. Having asserted that (contrafactual, contra-legal) conclusion, Sorto argues (at 23–24) that section 2254(b)(1)(B)(ii)'s narrow exception to the exhaustion requirement for a habeas petitioner whose State's "corrective process" is "ineffective to protect" his rights applies to him and justifies excusing him from the state habeas process entirely.

This argument does not hold water. Sorto's presumption that simply adding new evidence to an already adjudicated *Atkins* claim creates a new claim is no longer viable after *Pinholster*. And even before *Pinholster*, this Court had rejected claims that one more (or less) IQ score sufficed to give second life to an exhausted *Atkins* claim. *Morris v. Dretke*, 413 F.3d 484, 495–98 (5th Cir. 2005). In addition, Sorto's fault with the State's corrective process is that Texas does not give funds to successive habeas petitioners to develop their claims. *See* Sorto Br.25–26. But in Sorto's case, Texas is not required to do so. *See Roberts v. Dretke*, 356 F.3d 632, 640 (5th Cir. 2004). And in any event, in 2010, Sorto was filing his second successive (third total) state-court habeas application and providing evidence to support an *Atkins* claim for the very first time. Thus, the only reason that Sorto was required to meet the prima facie threshold to obtain funding for his *Atkins* claim was because *two sets of prior attorneys* who had access to such funding passed on the claim. With the well-represented Sorto having failed to avail himself of this process for obtaining funding, it was certainly not ineffective process for the state court to decline to fund Sorto's third application absent a prima facie showing that his claim had merit. The failure to protect Sorto's rights is attributable to Sorto, whose attorneys used some state-court funding at trial to investigate and ultimately reject an intellectual-disability claim and then later chose not to pursue additional funding to raise an *Atkins* claim in his initial state application.

### 1. Sorto cannot use evidence developed in federal court to challenge the state court's denial of his *Atkins* claim.

Since at least its landmark decision in *Pinholster*, the Supreme Court has held that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." 563 U.S. at 185. "[E]vidence later introduced in federal court is irrelevant to § 2254(d)(1) review." *Id.* at 184; *see Clark v. Thaler*, 673 F.3d 410, 416–17 (5th Cir. 2012) (holding review under section 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits). The same rule "necessarily applies to a federal court's review of purely factual determinations under § 2254(d)(2)." *Blue*, 665 F.3d at 656. As the Supreme Court recently reaffirmed, under section 2254(e)(2), even in federal review of unadjudicated claims, evidence not "present[ed] to the state courts in compliance with state procedural rules" cannot be considered absent extremely narrow exceptions. *Shinn v. Ramirez*, 142 S. Ct. 1718, 1730 (2022). Ultimately, Subsections (d) and (e)(2) thus work in tandem to limit federal petitioners' ability to challenge state-court adjudications with new evidence. *See Pinholster*, 563 U.S. at 181.

Sorto has raised *Atkins* twice: in his 2006 *pro se* habeas application, ROA.1613, and again in 2010, following the stay issued by the federal court. ROA.1213–14, 1614. Because Sorto's counsel chose not to raise an *Atkins* claim in his initial habeas proceedings, his successive state habeas application could be considered by the CCA only if "the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application," or if, "by clear and convincing evidence, but for

a violation of the United States Constitution[,] no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial." Tex. Code Crim. Proc. Art. 11.071 § 5(a)(1), (a)(3). Thus, section 5 "provides a state-law actual innocence gateway through which a defendant may present an *Atkins* claim that would otherwise be procedurally barred under state law." *Busby v. Davis*, 925 F.3d 699, 710 (5th Cir. 2019). "[B]ecause a person who is intellectually disabled is constitutionally ineligible for the death penalty, 'no rational juror would answer any of the special issues in the State's favor, if only for the simple reason that the statutory special issues would not be submitted to the jurors in the first place.'" *Id.* But section 5(a)(3) of article 11.071 "require[s] a *threshold* showing of evidence that would be at least *sufficient to support* an ultimate conclusion, by clear and convincing evidence, that no rational factfinder would fail to find [intellectual disability]." *Id.* at 709 (emphases added). If a state habeas petitioner cannot meet that threshold, the successive writ is dismissed as an abuse of the writ. *See* Tex. Code Crim. Proc. art. 11.071 § 5(c). That is what happened here. ROA.1614. And a state court determination that a petitioner did not meet that threshold showing of intellectual disability in presenting an *Atkins* claim is reviewed for reasonableness under § 2254(d)(2). *See Blue*, 665 F.3d at 656–57. Sorto seeks review of the CCA's determination, but he also relies on new evidence to support it. But he cannot. First, "[r]eview of factual determinations under [section] 2254(d)(2) is expressly limited to 'the evidence presented in the State court proceeding.'" *Shoop v. Twyford*, 142 S. Ct. 2037, 2043 (2022) (quoting 28 U.S.C. § 2254). Second, pursuant to *Pinholster*, "review of legal claims under [section] 2254(d)(1) is also

'limited to the record that was before the state court.'" *Id.* at 2044 (quoting 28 U.S.C. § 2254). Moreover, the evidence is barred by § 2254(e)(2) as well. As *Shinn* unequivocally held, the district court may supplement the state court record only if Sorto satisfies "one of two narrow exceptions." 142 S. Ct. at 1728. The claim must rely on either (a) "a new rule of constitutional law" that can be retroactively applied, or (b) a "factual predicate that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2)(A). In addition, the petitioner must show that "the desired evidence would demonstrate, 'by clear and convincing evidence,' that 'no reasonable factfinder' would have convicted him of the charged crime." *Shoop*, 142 S. Ct. at 2044 (quoting 28 U.S.C. § 2254(e)(2)(B)). Thus, AEDPA "bars evidentiary hearings in federal habeas proceedings initiated by state prisoners," *McQuiggin v. Perkins*, 569 U.S. 383, 395 (2013), in all but the most "extraordinary cases," *Shinn*, 142 S. Ct. at 1728. *See Williams v. Taylor*, 529 U.S. 420, 437 (2000) ("Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.").

Sorto's brief before this Court does not claim a new constitutional rule or the actual innocence exception discussed in *Shinn*.[4] Nor can he show that the factual

---

[4] The absence of a claim of actual innocence itself means that Sorto is not entitled to relief under this Court's case law, *Crawford v. Cain*, No. 20-61019, 2023 WL 3560479, at *9 & n.5 (5th Cir. May 19, 2023)—particularly when combined with an IQ score of 95 at the time of trial, ROA.957.

predicate could not have been previously developed given that he was examined by two psychiatrists before trial and found not to have an intellectual disability.

> ### 2. Because Sorto cannot use the evidence in federal court, the district court should not have funded its creation.

Because Sorto could not use any evidence obtained in this proceeding, even after *Ayestas*, the district court should have denied funding to conduct further psychological testing. This Court may affirm the district court's decision on any basis supported in the record. *E.g.*, *Batchelor v. Cain*, 682 F.3d 400, 404 (5th Cir. 2012); *Hunt v. United States*, 106 F. App'x 888, 889 (5th Cir. 2004). Here the Court need not delve into whether the district court should have granted habeas relief based on the evidence developed using federal funds because the federal funds should not have been authorized to begin with.

Sorto filed several motions for funds in federal court. ROA.1208. Initially, the district court properly denied his requests because Sorto had not shown that his claims were not procedurally barred. ROA.1209–11 (summarizing the procedural history). On remand, without explaining how the Supreme Court's decision in *Ayestas* changed its analysis, the district court reversed course and concluded "that funding for a comprehensive adaptive functioning assessment is 'reasonably necessary' for [Sorto's] representation." ROA.1436 (citing 18 U.S.C. § 3599(f)). The court also held that "an additional $7,500 in funding to hire Dr. Gilbert Martinez [Sorto's long-time medical expert] to perform said assessment is 'necessary to provide fair compensation for services of an unusual character or duration.'" ROA.1436 (quoting 18

U.S.C. § 3599(g)(2)). The district court got it right the first time—or more precisely, the first three times.

**a.** Section 3599(f) provides that "[u]pon a finding that investigative, expert, or other services are reasonably necessary . . . the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant." 18 U.S.C. § 3599(f). *Ayestas* reaffirmed that "district courts have broad discretion in assessing requests for funding," but clarified that this Court had adopted too stringent a standard when it required "substantial need" before authorizing habeas petitioners' requests for 18 U.S.C. § 3599 funding. *Ayestas*, 138 S. Ct. at 1093–94.

In *Ayestas*, the petitioner argued that his trial-level counsel was ineffective because he failed to investigate mitigating evidence that would have convinced the jury not to sentence him to death. *Id.* at 1087. Having failed to raise that claim before the state court, however, it was procedurally defaulted. *Id.* He could thus raise the claim only if he could show under *Trevino v. Thaler*, 569 U.S. 413 (2013), "that the claim is substantial and that *state* habeas counsel was also ineffective in failing to raise the claim in a state habeas proceeding." *Ayestas*, 138 S. Ct. at 1087 (emphasis added). That required funding to investigate. *Id.* at 1087–88. Consistent with its prior precedent, this Court held that Ayestas was not entitled to that funding because he could not show that he had a "substantial need" for the services. *Id.* at 1093.

The Supreme Court reversed because the statute does not speak in terms of "substantial need" but whether the funding is "reasonably necessary." *Id.* The Court acknowledged that "the difference between the two formulations may not be great," but it was concerned that this Court's test was "arguably more demanding."

*Id.* In determining what is "reasonably necessary," the Court explained, the district court should examine "whether a reasonable attorney would regard the services as sufficiently important." *Id.* Funding can be "sufficiently important" if it "stands a credible chance of enabling a habeas petitioner to overcome the obstacle of procedural default." *Id.* at 1094. By contrast, the Court cautioned, "it would be quite unreasonable[]to think that services are necessary to the applicant's representation if, realistically speaking, they stand little hope of helping him win relief." *Id.* In sum, the Court held that "[p]roper application of the 'reasonably necessary' standard thus requires courts to consider the potential merit of the claims that the applicant wants to pursue, the likelihood that the services will generate useful and admissible evidence, and the prospect that the applicant will be able to clear any procedural hurdles standing in the way." *Id.*

"*Ayestas* did not disturb the long-settled principle that district courts have discretion to separate 'fishing expeditions' from requests for funding to support plausible defenses." *Jones*, 927 F.3d at 374; *see also, e.g.*, *United States v. Hamlet*, 480 F.2d 556, 557 (5th Cir. 1973) (per curiam) (finding district court properly determined that defendant's request for a psychiatric expert was not in good faith). To the contrary, *Ayestas* emphasized that "an applicant must 'articulat[e] specific reasons why the services are warranted'—which includes demonstrating that the underlying claim is at least 'plausible,'" and "there may even be cases in which it would be within a court's discretion to 'deny funds after a finding of "reasonable necessity."'" 138 S. Ct. at 1094.

Indeed, in Ayestas itself, funding was ultimately denied as not "reasonably necessary." *Ayestas v. Davis*, 933 F.3d 384, 395 (5th Cir. 2019). In reaching that conclusion, this Court conducted a searching examination of the record, which "show[ed] that state-habeas counsel provided aggressive, competent, and professional representation." *Id.* at 390–91. And "[g]iven the evidence that state-habeas counsel was not deficient, joined with the unlikelihood of locating new information suggesting otherwise, funding for investigatory services cannot be reasonably necessary." *Id.* at 395. Such a review is mandated by *Ayestas*, which "emphasized that the touchstone of the inquiry is 'the likely *utility* of the services requested' and that '§ 3599(f) cannot be read to guarantee that an applicant will have enough money to turn over every stone.'" *Crutsinger v. Davis*, 898 F.3d 584, 586 (5th Cir. 2018) (quoting *Ayestas*, 138 S. Ct. at 1094).

**b.** Here, because Sorto had not demonstrated that the CCA's determination was unreasonable or that his evidence may be considered under § 2254(e)(2), the district court's decision improperly authorized a fishing expedition for evidence that was not admissible in federal court. Because the evidence was not properly raised in state court, it cannot be used to impeach the reasonableness of the state court's decision that Sorto had not proven an intellectual disability exempting him from the death penalty.

Moreover, in initially denying the funds, the district court "surveyed the record" and found that Sorto had failed to show that "additional exploration of his *Atkins* claim was reasonably necessary in light of contradictory evidence in the record."

ROA.1211. Nothing in *Ayestas* changed that calculus or permitted the district court to order funding under those circumstances.[5]

3.    **The district court correctly did not consider newly developed evidence in assessing the reasonableness of the CCA's 2010 decision.**

Notwithstanding that the erroneous grant of funding to develop evidence has no practical utility, the district court properly declined to disturb its prior ruling denying habeas relief. The CCA's ruling on the threshold *Atkins* assessment was indisputably correct and Sorto's present arguments would fail for essentially the same reasons. And in any event, Sorto cannot overcome the deference owed in a federal court's review of a state court's habeas decision, which is "highly circumscribed." *Shinn*, 142 S. Ct. at 1732. Specifically, Sorto cannot overcome the reasonableness of the CCA's implicit and explicit factual determinations in rejecting Sorto's claim. *See* 28 U.S.C. § 2254(e)(1).

A state habeas petitioner is entitled to relief from the district court only if the state court's holding is "'contrary to, or involved an unreasonable application of,' Supreme Court precedent that was 'clearly established' at the time of the adjudication," *Shoop v. Hill*, 139 S. Ct. 504, 506 (2019) (per curiam) (quoting 28 U.S.C. § 2254(d)(1)), or "resulted in a decision that was based on an unreasonable

---

[5] It is no response to point to evidence Sorto located *using* the improperly authorized funds. It was Sorto's burden to establish that he was entitled to the funding at the time he asked for it. *Crutsinger*, 898 F.3d at 587. The State is aware of no principle or case allowing him to meet that burden by bootstrapping the evidence improperly obtained. Such a rule would, after all, make an improper grant of federal funding effectively unreviewable.

determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

With respect to the court's legal conclusions, the decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair[-]minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). The state court's determination of the facts is "presumed to be correct," and the petitioner bears "the burden of rebutting th[at] presumption" "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). And whether he has met that burden depends on the evidence before the CCA in 2010, when it dismissed his successive habeas petition. *See Pinholster*, 563 U.S. at 187 n.11 (barring consideration of *any* new evidence to attack a state-court adjudication).

**a.**  Under Texas law, a prima facie showing of intellectual disability requires "(1) significantly subaverage general intellectual functioning, defined as an IQ of about 70 or below; (2) accompanied by related limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18." *Blue v. Thaler*, 665 F.3d 647, 657–58 (5th Cir. 2011) (cleaned up). With regard to intellectual functioning, Texas requires a full-scale IQ score from a test recognized by professional psychological organizations. *See Maldonado v. Thaler*, 625 F.3d 229, 240 (5th Cir. 2010). Adaptive functioning, by contrast, evaluates the presence of "significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility." *Id.* at 241. Adaptive functioning should be "determined by clinical assessment and, usually, standardized scales." *Id.*

Sorto does not dispute that he did not offer a full-scale IQ test result in support of his state habeas petition. ROA.1408–09. That alone was a procedural fault that made his claim nonviable under state law. *Blue*, 665 F.3d at 658. But there was other evidence that undermines his claim as well: the district court noted that some of the very affiants upon whom Sorto now relies testified at trial that he maintained steady employment, was able to support his family in the United States and in Mexico, and was able to participate in his own defense; moreover, based on trial counsel's observations, he showed no signs of intellectual disability. ROA.1367. Perhaps most tellingly, Dr. Silverman—one of Sorto's own experts who interviewed him three times—testified that he reviewed the results of the psychological testing done to evaluate Sorto's intellectual disability. ROA.485. On cross-examination, he testified that the defense hired Dr. Rosin, a Spanish-speaking psychologist, to test Sorto about four months before his trial. ROA.485–86. Dr. Silverman conducted "a mental status examination which is considered to be a cognitive test." ROA.486. Far from finding Sorto intellectually disabled, Dr. Silverman concluded that Sorto's intelligence "could be above average"—at least by a "little bit." ROA.486. Given that evidence, the CCA's holding that Sorto's 2010 application failed to make a threshold showing that he would ultimately be able to show intellectual disability by clear and convincing evidence was entirely reasonable.

**b.**    Sorto makes three counterarguments. None show that "no 'fairminded juris[t]' could have reached the same" judgment. *Shinn*, 142 S. Ct. at 172. 1732. *First*, Sorto asserts (at 19) that the CCA's decision conflated Sorto's obligation to make a prima facie case of intellectual disability with the ultimate requirement that Sorto

actually *prove* intellectual disability. To start, as the trial court held, ROA.1139–40, and this court implied in its withdrawn opinion, *Sorto*, 859 F.3d at 362, that assertion misreads the CCA's opinion. Sorto's claim was not dismissed because he failed to prove the disability; it was dismissed because he failed to present a prima facie case of intellectual disability. ROA.1206.

*Second*, Sorto insists (at 20) that the TONI score "provide[s] compelling prima facie evidence" of intellectual disability. But the TONI test is widely rejected by courts as inaccurate. S*ee, e.g.*, *Maldonado*, 625 F.3d at 240 ("'the standard professional view' [is] that the []TONI is not a measure of general intelligence"). In addition, that test is not a full-scale IQ test and was not administered by an expert with an eye towards *Atkins*. It is a screening test administered by prison professionals to prisoners entering the prison system to get a rough estimate of prisoners' intellectual capabilities for the purposes of prison administration. ROA.487–88; *see also Hernandez v. Thaler*, Civ. No. 08–805, 2011 WL 4437091, at *13 (W.D. Tex. Sept. 23, 2011) (Dr. Martinez in another case describing the TONI as a "screening tool designed to ascertain only a gross estimate of a subject's intellectual capabilities based upon a relatively brief evaluation process (about fifteen minutes)."). In Sorto's case, when he was tested in December 2003, the testing administrator indicated concern that the score was invalid, stating, "TONI-3 quotient of 66. This provider does not feel this quotient is accurate due to the language and culture barrier and difficulty with interpretations. It is felt Pts quotient should be in the lower average to average range." ROA.488, 732. There is no reason to think this statement was anything other than the administrator's honest opinion: there was no *Atkins* claim pending at the

time, and even if there were, "government actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009).

*Third*, Sorto's quibbles with the record do not cast doubt on the CCA's analysis. He cannot rebut, by clear and convincing evidence, the presumption that the state court's determination of the facts is correct, because the court's holding is "well supported by the record." *Austin v. Davis*, 876 F.3d 757, 780 (5th Cir. 2017). None of the evidence Sorto presents to accompany his TONI score suffices to overcome that persuasive body of evidence.

Sorto asserts (at 20) that the TONI score was "buttressed" by sworn affidavits describing Sorto's alleged adaptive deficits. Specifically, alongside the TONI test administered to him by TDCJ in 2003, Sorto relies heavily on statements by many of the same witnesses who portrayed him as a competent adult during the mitigation stage of trial, *see* ROA.660, and a comment from Dr. Martinez that his math skills appeared to be those of a 7-year-old child, ROA.662.

The affidavits of Sorto's family and friends do not show the CCA acted unreasonably. Sorto highlights comments about his stuttering and speech, ROA.491, poor performance in school, ROA.492, and that he was naïve and often taken advantage of, ROA.493. Sorto also argued that the affidavits showed that he had difficulty dressing, doing simple calculations needed for work, and learning new job skills. ROA.493–94. But poor school marks could indicate a learning disability or disinterest—particularly given testimony that his interactions with other children his age were normal, and he could be trusted to run errands for his family. ROA.493. And as

the district court correctly noted, testimony from those same witnesses during the punishment phase painted an entirely different picture than the one upon which Sorto now relies. *See* ROA.1366–67. It is for this reason that the Supreme Court has held that a finding of intellectual disability cannot turn on the type of anecdotal observations that "ha[ve] no grounding in prevailing medical practice" and "invite[] 'lay perceptions of intellectual disability' and 'lay stereotypes.'" *Moore v. Texas*, 139 S. Ct. 666, 669 (2019).

Nor can Dr. Martinez's report, standing alone, undermine the CCA's decision. After all, Martinez had not yet actually opined that Sorto was intellectually disabled—no doubt, in part, because (unlike his trial expert) Dr. Martinez never interviewed Sorto. *See* ROA.873, 1367. Indeed, it seems as if Dr. Martinez also had not reviewed the history of Dr. Rosin's testing.[6] ROA.487 & n.40. Under such circumstances, it was entirely reasonable for the CCA to conclude that Dr. Martinez's statements did not raise even a "*threshold* showing of evidence that would be at least *sufficient* to support an ultimate conclusion, by clear and convincing evidence, that no rational factfinder would fail to find" Sorto intellectually disabled. *Busby*, 925 F.3d at 709.

## B.  Any putative deficiencies in Texas's post-conviction processes do not excuse Sorto from AEDPA's requirements.

To avoid AEDPA's deferential review of state-court judgments, Sorto asserts (at 23) that the State's post-conviction process "was ineffective to protect [his]

---

[6] The court later compelled Sorto to reveal Dr. Rosin's notes, which the State attached to its answer to Sorto's second amended federal habeas petition. ROA.950.

Eighth Amendment rights" because it did not provide him with funding to develop his *Atkins* claim before requiring him to make a prima facie showing of intellectual disability. Sorto's position (at 23) is that his *Atkins* claim is unexhausted because it "contains material additional evidentiary support" developed post-2010, and a federal court can consider an unexhausted claim pursuant to section 2254(b)(1)(B)(ii) if "circumstances exist that render [the state corrective] process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B)(ii). Sorto's neat solution to his funding problems, however, is contrary to *Pinholster* and the "comity, finality, and federalism" preserved by AEDPA. *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017).

**1. Sorto has exhausted his claim through a constitutionally sufficient state-court process.**

Sorto is wrong that he is entitled to a third bite at the *Atkins* apple in state court. Sorto argues that the evidence adduced by the district court's (erroneous) grant of funding after 2010 "contains material additional evidentiary support compared to the claim presented to the state court in 2010"—thereby rendering his twice-raised claim "unexhausted." Sorto Br. 23 (citing *Lewis v. Quarterman*, 541 F.3d 280, 284 (5th Cir. 2008)). But Sorto's factual-exhaustion theory provides no path around AEDPA. Even at its height, factual exhaustion was a one-way ratchet designed to protect federal-state comity, not benefit petitioners. *See Vasquez v. Hillery*, 474 U.S. 254, 257–60 (1986). Before AEDPA petitioners could only "supplement" evidence presented in state court. *Id.* at 260. To now use the factual-exhaustion doctrine as the means to allow in significant new facts and evidence would turn the doctrine on its head. More fundamentally, factual exhaustion has no role to play after AEDPA, a

Case: 22-70013    Document: 54    Page: 49    Date Filed: 06/01/2023

statute, trumped that doctrine. *See City of Milwaukee v. Illinois*, 451 U.S. 304, 313–16 (1981). Indeed, *Pinholster* read AEDPA to preclude the use of all new facts and evidence to attack a state court's adjudication of a claim. 563 U.S. at 182–85.

Sorto's counterarguments fail. To start, Sorto relies on cases that largely predate *Pinholster* and entirely predate *Shinn*, and which therefore should no longer be considered good law. *Pinholster* and *Shinn* together stand for the proposition that federal courts are to respect both the state court and state court process by judging state court decisions based only on evidence properly entered before the state court using the state court's rules. *Pinholster*, 536 U.S. at 185; *Shinn*, 142 S. Ct. at 1730. By contrast, the precedent upon which Sorto relies turns on whether "new evidence"— not new claims—is "determined to be exhausted." *Lewis*, 541 F.3d at 285. Such a rule that superimposes federal court rules of evidence onto the state courts and then judges the state courts by that evidence is irreconcilable with *Pinholster* and *Shinn. In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021) ("In basic terms, then, a 'Fifth Circuit precedent is implicitly overruled if a subsequent Supreme Court opinion "establishes a rule of law inconsistent with" that precedent.'").

Even if Sorto's authority were still good law, it is distinguishable: because Sorto's additional evidence is different in degree rather than kind, even under these cases, his claim is not rendered "unexhausted" for purposes of section 2254(b)(1)(B)(ii). For example, in *Lewis*, this Court explained that a claim can become unexhausted if the new "[e]vidence is material," that is "if it *fundamentally alters, not merely supplements*, the claim presented in state court." 541 F.3d at 284– 85. Applying that standard, the Court found that an affidavit from a doctor

supporting the petitioner's argument that an expert erred in administering his IQ test *did not* fundamentally alter his earlier arguments concerning that expert. *Id.* at 285.

Sorto does not specify what part of the evidence available now he considers to fundamentally alter his earlier *Atkins* claim. *See* Sorto Br. 23. None does. His full-scale IQ score was more consistent with his TONI score, but his "overall performance validity test score profile," illustrating whether he was putting actual effort into the testing, "was somewhat variable," although within the range of expected scores for individuals in his position. ROA.1512. In addition, Sorto's first trial score for the TOMM test, the "test of Memory Malingering" that serves the same purpose, was well below the cutoff for intellectually disabled persons, although it improved on the second trial. ROA.723. And the rest of the "additional evidentiary support," *id.*, is much like the old. For adaptive deficits, his evidence remained limited to contradictory statements of family and friends, which are categorically insufficient to constitute clear and convincing evidence of an intellectual disability in the light of his earlier score of 95 and extensive evidence that he was a functioning adult at the time of trial. *See* ROA.660.

*Ibarra v. Thaler* is not to the contrary. 691 F.3d 677 (5th Cir. 2012), *vacated in part on other grounds*, 723 F.3d 599 (5th Cir. 2013). Leaving aside the fact that the decision was vacated, Ibarra had "presented essentially no supporting evidence" at the time of his initial petition. *Id.* at 681. By contrast, Sorto had evidence—the TONI score of 66 and anecdotal testimony concerning adaptive skills—but it was just insufficient to satisfy state law. Under AEDPA, this Court is not "tasked with

determining whether . . . new evidence . . . presented to the federal district court was exhausted," because all new evidence is prohibited. *Clark*, 673 F.3d at 417. The only purpose served by Sorto's reliance on *Ibarra* is an impermissible one: evading AEDPA's bar on new evidence by judicially creating a "new" claim to be exhausted.

### 2. Sorto cannot circumvent sections 2254(d) and 2254(e) by alleging that the state-corrective process is ineffective.

Sorto alleges (at 25) that he "is effectively precluded from exhausting his [*Atkins*] claims in state court," *Sells*, 536 F. App'x at 492, because he cannot meet the "prima facie" standard without funding. But the provision on which he attempts to rely, section 2254(b)(1)(B)(ii), has not been invoked for simple funding issues that do not create a due process problem. Sorto's theory is inconsistent with this Court's precedent, and if accepted, would gut the exhaustion requirement in *Atkins* claims.

As an initial matter, Courts recognize that section 2254(b)(1)(B)(ii) applies only in "extraordinary circumstances," *Fuller v. Rich*, 11 F.3d 61, 62 (5th Cir. 1994) (per curiam), and only "if there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient as to render futile any effort to obtain relief," *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981) (per curiam). That sub-section provides a path to federal habeas review only in "rare cases where exceptional circumstances of peculiar urgency mandate federal court interference." *Deters v. Collins*, 985 F.2d 789, 795 (5th Cir. 1993).

In its now-vacated opinion, this Court suggested that Texas's procedures were ineffective as applied here "in the specific circumstances of this case," because Sorto's testing eventually produced an under-70 IQ score. *Sorto*, 859 F.3d at 365.

Sorto does not attempt to characterize himself as unique in that fashion—instead he relies (at 25–26) on the story described by the CCA in *Ex Parte Blue*, 230 S.W.3d 151, 167 (Tex. Crim. App. 2007), to demonstrate his plight as an IFP petitioner whose counsel determines, after his first state habeas application, to pursue an *Atkins* claim. But that strategy illustrates the major flaws with Sorto's position.

As *Ex Parte Blue* demonstrates, Sorto's claims are *not* unique. Plenty of appointed habeas counsel seek to raise an *Atkins* claim in a successive state habeas proceeding—it cannot be the case that the state post-conviction process is ineffective and must be set aside for *all* of them. *E.g.*, *Petetan v. State*, 622 S.W.3d 321, 322–33 (Tex. Crim. App. 2021) (discussing history of this litigation in Texas). As a result, to find insufficient constitutional protections any time the hypothetical petitioner in *Blue* sought federal habeas relief would be to call into question the constitutionality of Article 11.071 in any *Atkins* claim. But this Court has already held that application of Article 11.071 to *Atkins* claims "is not 'contrary to clearly established Federal law, as determined by the Supreme Court of the United States.'" *Busby*, 925 F.3d at 713 (ellipsis omitted).

Even in *Blue*, the CCA did not argue that Texas's post-conviction process was unconstitutional; instead, it emphasized that the situation merely reflects an area of discretion left to the States with no contrary Supreme Court guidance. The Supreme Court has unambiguously held that, as a matter of federal constitutional law, the petitioner ordinarily must "bear responsibility" for all attorney errors during state postconviction proceedings, where there is no constitutional right to counsel. *See Williams*, 529 U.S. at 432. The Court has further declined to recognize such a

constitutional right in state postconviction proceedings. *Davila*, 137 S. Ct. at 2065. In such cases, any alleged loss of an opportunity a state petitioner claims to protect his rights has occurred as a result of the petitioner's actions—or inaction.

For example, in *Jones v. Jones*, 163 F.3d 285, 299–300 (5th Cir. 1998), this Court assumed *arguendo* that section 2254 included a futility exception to exhaustion but held that the petitioner could not avail herself of such an exception even though state-court relief was no longer available for her IATC claims. Jones, the Court held, "allowed her state law remedies to lapse without presenting them to the state courts in a timely application for post-conviction relief." *Id.* at 299 (cleaned up). "Under such circumstances, she cannot find shelter under the assumed futility exception." *Id.* (citing *Coleman v. Thompson*, 501 U.S. 722, 732 (1991)).

In addition, this case does not present the facts faced by the hypothetical attorney described in *Ex parte Blue*. Sorto's problem is not that there is no evidence in the trial record, it is that the evidence disproves his claim. Sorto's trial counsel had already investigated the possibility that Sorto may have some mental disability. One psychiatrist, who met with Sorto multiple times, "detected no real evidence of [cognitive] impairment." ROA.1766. Neither did his lawyers. ROA.379, 566. In addition, Sorto was represented by counsel for his initial state habeas proceeding; had he and his counsel agreed to present the merits of the *Atkins* claim, he could have successfully raised it then and received funding.

Both trial counsel and post-conviction counsel drilled down on potential avenues of relief, such as PTSD and chemical poisoning, and IATC for failure to find more mitigation evidence, rather than an *Atkins* claim. "Having refused to exercise

options available to him, [Sorto] cannot successfully argue to this Court that his hands are tied." *Deters*, 985 F.2d at 796–97. The fact that Texas's post-conviction procedures do not assist petitioners in making an eleventh-hour change of strategy does not mean the procedures are ineffective.

Accepting Sorto's claim risks creating the adverse incentives about which the Supreme Court has repeatedly warned in AEDPA cases. Petitioners have an incentive to "strategically concede" certain claims are unexhausted to obtain de novo review." *Ward v. Stephens*, 777 F.3d 250, 257 n.3 (5th Cir. 2015), *abrogated on other ground by Ayestas*, 138 S. Ct. 1080. If Sorto is right, a petitioner with a colorable but weak *Atkins* claim should wait out the clock until state funding is no longer available. In doing so, he can avoid AEDPA deference entirely because the unavailability of funding on demand renders (in Sorto's view) the process unconstitutional. And if a State's legislature determines that it will condition funding for state habeas petitioners on meeting certain criteria, a state petitioner seeking to avoid the criteria can simply turn to federal court to argue that those limitations make the state post-conviction process "ineffective," cutting the State out of the post-conviction process or forcing it to provide funding in every case. Those results cannot be squared with the notion that AEDPA protects "comity, finality, and federalism," *Davila*, 137 S. Ct. at 2064.

## Conclusion

The Court should deny a certificate of appealability on Sorto's federal habeas claim.

Respectfully submitted.

John Scott
Provisional Attorney General

Brent Webster
First Assistant Attorney General


Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Lanora C. Pettit
Acting Solicitor General

/s/ Kathryn M. Cherry
Kathryn M. Cherry
Assistant Solicitor General
Kathryn.Cherry@oag.texas.gov

Counsel for Respondent Appellee

## CERTIFICATE OF SERVICE

On May 31, 2023, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Kathryn M. Cherry
KATHRYN M. CHERRY

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,337 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Kathryn M. Cherry
KATHRYN M. CHERRY